[Crim. No. 477. First Appellate District.—January 28, 1914.]

THE PEOPLE, Respondent, v. ELMER PRATHER, Appellant.

CRIMINAL LAW—FORGERY—EVIDENCE OF CONDUCT AND TRANSACTIONS LEADING UP TO CRIME.—Where it appears on a prosecution for forging travelers' checks that the defendant and his associate had acted in concert throughout a general scheme to relieve the complaining witness of whatever of value he possessed, including the checks, and to turn the latter into money by whatever criminal means might be required, the prosecuting witness may testify of a conversation which he had with the defendant's associate before the defendant appeared on the scene, and also of conversations and conduct after the defendant joined his associate and the complain-

23 Cal. App.—46

ing witness, before the acquisition and forgery of the checks, as to the laying of illegal bets on a horse race, in the course of which the complaining witness lost all his ready money.

Id.—Indorsement of Traveler's Check—Indictment for Forgery—Variance.—Where an information charges the forgery of "a certain indorsement" of a traveler's check, and the evidence shows that the forged signature was written, not on the back of the check, but on the face thereof at the place indicated as essential to its transfer, there is no variance between the information and the proof.

Id.—Negotiable Instrument—Indorsement on Face.—The writing of the name of the payee of a traveler's check on its face, at the place indicated thereon as essential to its transfer, constitutes an indorsement thereof within the intendment of section 3108 of the Civil Code.

APPEAL from a judgment of the Superior Court of Alameda County and from an order refusing a new trial. Fred V. Wood, Judge presiding.

The facts are stated in the opinion of the court.

Burns & Watkins, for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

RICHARDS, J.—This is an appeal from a judgment of conviction of appellant, who was charged with the crime of forgery, and from an order denying his motion for a new trial.

The first contention of appellant is that the court erred in permitting the prosecuting witness Thompson to testify to a certain conversation with a man named Rock on the streets of Oakland out of the hearing of the defendant and before he had appeared upon the scene; the second contention of the appellant is that the court erred in admitting the evidence of said Thompson as to certain conversations and conduct after he had joined Rock and Thompson, but before the transactions out of which this case arose, as to the laying of certain illegal bets on a horse-race, in the course of which Thompson lost all of his ready money. The appellant contends that the evidence of this episode amounted to an attempt to prove another, separate and distinct offense from that with which the appellant is charged herein, to

his prejudice in the present case. These two contentions of the appellant may be considered together since they each involve a review of the evidence in the case for the purpose of determining what the relationship, intent, and conduct of the defendant and of the absent Mr. Rock were in respect to Thompson, and to the particular offense of which the defendant stands convicted.

A careful perusal of the record convinces us that the following facts were fairly deducible by the jury from the evidence in the case:

Prather and Rock had known each other for some time prior to the occurrence out of which the arrest of the former arose. They had been playing the races together, and were well enough acquainted and acting sufficiently in concert for Prather to regard and speak of Rock as his "friend" or "partner." Rock was already known to the police of San Francisco as a suspected buncoman whose presence in that city was not desired. The pair were together in Oakland on the afternoon of March 24, 1913; and in view of their conduct in the affair of Thompson, were on the look-out for a victim to fleece. Rock accosted Thompson, whom he found to be a stranger in town, and at once became chummy and offered to show him the "fifty million dollar hotel." They walked up the street together with Prather evidently hovering near. The talk between Rock and Thompson before Prather joined them, the admission of which was objected to by the defense, does not seem to have been harmful to any material degree. It simply led up to the opportune moment for introducing the defendant into the scene. The way in which Prather was presented to Thompson, as a man whom Rock had known in Denver, was in itself a false and fraudulent pretense, shedding a strong light on the criminal purpose with which the pair were attaching themselves to Thompson. They presently began to discuss the subject of betting on the races, and induced Thompson to join them in laying a small wager. This was an easy and not unusual method of finding out what money Thompson had. The first play was successful, and naturally led to another and larger venture, involving all the money which Thompson had upon his person; and this, of course, he lost. The defendant objected to the admission of the evidence of this

episode upon the ground that it amounted to proof of a separate, distinct and antecedent offense unconnected with the crime of forgery with which the defendant is charged in this case. But it does not require either a close reading or strained construction of the record to discern that the subject of playing the races was presented and pursued merely as a progressive step in the art of separating Thompson from whatever of value he possessed. When the pair had thus procured all of Thompson's ready money, Prather, who had received it, went off, so that if their victim made trouble the holder of their ill-gotten gains would be out of his way. Rock stayed with Thompson to ply him with liquor, keep him free from suspicion, and discover whether he had anything else of value of which he could be relieved. He presently found that Thompson had a number of travelers' checks, issued by Wells, Fargo & Co., of which the instrument set forth in the information is a sample, and which aggregated in value the sum of two hundred and sixty dollars. He assisted in the passing of one of these checks in a saloon during the evening, and thus saw that the signature of Thompson was essential to their transfer. Then he succeeded in enticing their apparently intoxicated possessor to a strange room, where he presently got possession of the checks and then went away. The next morning Rock and Prather are seen together, with the latter in possession of the checks. They go to the pawnshop of the witness Bernstein, where Rock wishes to redeem an overcoat. The name of Thompson had been written on some of these checks in the meantime, though by which of them does not appear, except that Prather stated to one of the arresting officers later that he saw Rock writing Thompson's name on some of these checks. When the check in question here was offered to Bernstein it came from the possession of Prather, who then vouched for its validity, and thus procured its passage to Bernstein. A little later in the same day the pair met Thompson on the street. He was looking for Rock, whom he had been sober enough to see extract his checks from his pocket in the room on the night before, and from whom he now demanded them. Here occurred another chapter of the same sort of dissimulation as that attending their first meeting with Thompson, and from which the concert

of criminal purpose between Rock and Prather is plainly to be discerned. They inveigle Thompson into a saloon and there create a confusion, in the course of which they succeed in slipping away. They are next seen together in San Francisco two or three days later, where Prather, in order to deceive the police into thinking him a man of consequence, exhibits the remainder of these checks as "his credentials." They prove his undoing, and cause his detention and transfer to the custody of the Oakland police, to whom he makes a number of statements in the effort to cast the odium on Rock, who has escaped, but which only serve to enmesh himself by showing that he knew the character of Rock and that he had stolen these checks, and that the name of Thompson had been forged to them at the time he undertook to give them currency.

From the foregoing statement of the evidence it was a reasonable deduction for the jury to draw that Prather and Rock were acting in concert throughout, and hence that all that was said and done from the time Thompson first was sighted was but a part of their general scheme to relieve him of whatever of value he possessed, including these travelers' checks, and to turn the latter into money by whatever criminal means might be required. This disposes of the appellant's first two objections adversely to his contention.

The next and most serious contention of the appellant is that there is a fatal variance between the information and the proof in the following essential respect: The information charges the defendant with having feloniously made and forged "a certain indorsement" of the travelers' check in question "by then and there falsely indorsing thereon the name of A. Thompson" and the word "bearer"; and with having uttered and passed the said check to Morris Bernstein as true and genuine, knowing the said indorsement of said check to be false and forged. The instrument in question is set forth in full in the information. It is in the usual form of the so-called travelers' checks issued by Wells, Fargo & Co., and had a face value of ten dollars. Omitting the nonessentials it reads substantially as follows: "Wells, Fargo & Co. at its paying agencies will pay to the order of ——————— ten dollars." In the upper right-hand corner

of the instrument are the words "when countersigned below with this signature." The person to whom such checks are issued is required to write his name under the above words, which also require that he shall again write the same name in the lower right-hand corner of the check under the word "countersigned," before presenting the check for payment or transferring it to another. It was this lower signature of A. Thompson, the original holder of the check, which the defendant was charged with having forged and with having issued knowing such name to be forged. When said travelers' check was offered in evidence it was objected to by the defendant upon the ground that the said lower signature of A. Thompson, even if conceded to have been forged, did not constitute an "indorsement" within the legal meaning of the term, and hence that there was a fatal variance between the information and the proffered proof. The evidence having been admitted he makes the same contention here.

The instrument in question is called a "Travelers' check," but is, more properly speaking, not of the form or effect of a check, but rather of a bank note, and is a negotiable instrument. When issued it was payable "to the order of ———————." This being so, it was payable to bearer when properly signed at the place indicated by the original holder to whom it was issued (Daniels on Negotiable Instruments, 5th ed., sec. 145). The insertion of the word "bearer" in the blank space in the body of the check was therefore not material to its validity or transfer to another than the original payee; but the writing of the name "A. Thompson" in the lower right-hand corner of the face of the instrument was by its express terms, made essential to its transfer from the original holder to another payee. The Civil Code defines indorsement as follows: "One who writes his name upon a negotiable instrument otherwise than as maker or acceptor and delivers it with his name thereon to another person is called an indorser, and his act is called indorsement." (Civ. Code, sec. 3108.) It is true that the word "indorsement" comes from a Latin compound meaning "on the back"; and it is also true that the sections of the Civil Code immediately following the section above quoted seem to contemplate that an indorsement of a negotiable

instrument should be on its back or on a separate paper attached to it; but the supreme court of this state, with section 3108 of the Civil Code expressly in view, has declared that "the indorsement may be made on the face of the note with the same effect as if made on the back." (*Shain* v. *Sullivan,* 106 Cal. 208, [39 Pac. 606], and cases cited.) This being so, the conclusion would seem to be irresistible that the writing of the name of A. Thompson, the original holder and payee of this instrument, on its face constituted an indorsement within the plain intendment of section 3108 of the Civil Code. It was the signature of the original holder of the instrument expressly required to give effect to its delivery and validity to its transfer to another payee; and hence its forgery, or the uttering, publishing, and passing of such instrument as true and genuine, knowing that the said signature of A. Thompson was forged, would constitute the offense charged in the information. There was therefore no variance between the terms of said information and the instrument when proffered and admitted in proof.

The judgment and order denying a new trial are affirmed.

Lennon, P. J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 27, 1914.